**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WAYNE CHARLESTON, JR.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO. 17-3039** |
| **CORIZON HEALTH, INC.,** *et al* | : | |

## MEMORANDUM

KEARNEY, J.                                                                                         April 12, 2018

      Incarcerated persons awaiting their criminal trial are entitled to medical care under the Fourteenth Amendment. These pre-trial detainees may request medical care through sick call slips. We expect our prison medical staff timely evaluate specific medical findings and move forward on remedial treatment as warranted. We do not expect prison doctors to place x-rays in a desk drawer and not look at them. We expect our prison officials timely address grievances of inadequate care. When the pre-trial detainee believes the prison medical staff and wardens harmed him through inadequate medical care, he may seek damages under the civil rights law.

      We today address a delayed diagnosis of cancer for a pretrial detainee after several sick call slips, medical center visits and, beginning on November 5, 2015, after an outside doctor recommended urgent action. The pre-trial detainee claims the prison medical staff and wardens failed to adequately treat his cancer before December 5, 2015. Extensive discovery confirms genuine issues of disputed material facts concerning many of the named defendants' inaction before December 5, 2015. Those issues include whether doctors, on or after November 5, 2015, and wardens, on or after September 7, 2015, exhibited deliberate indifference under the Fourteenth Amendment and whether other members of the prison medical staff negligently treated the pretrial detainee in 2015. Those disputed issues must be tried to the jury but the remaining claims are dismissed as a matter of law.

## I.    Undisputed Facts[1]

In January 2015, Wayne Charleston, Jr. arrived at Curran Fromhold Correctional Facility ("Prison") in Philadelphia as a pre-trial detainee in apparent good health.[2]  Mr. Charleston received medical treatment from numerous nurses, nurse practitioners, physician assistants, and physicians while in the Prison dating from his January 2015 intake through December 2015.  In December 2015, after months of complaining about illnesses to the Prison medical personnel as confirmed in sick slips, medical records and correctional officers' recollection, Temple University Hospital diagnosed Mr. Charleston with Stage IV nasopharyngeal cancer.   Mr. Charleston challenges the adequacy of medical care he received in response to sick calls and medical attention as a pretrial detainee. He claims the Prison's medical providers' deficient treatment delayed his eventual diagnosis of nasopharyngeal cancer.

### *Corizon's treatment before an outside doctor's November 5, 2015 diagnosis.*

Following an intake screen, the Prison first examined Mr. Charleston on January 16, 2015.[3] The Prison, through the City of Philadelphia's contracted medical provider Corizon Health, Inc.,[4] found Mr. Charleston in good health.  Corizon relied upon its Prison Site Director Dr. Bruce Blatt.[5]  As Medical Director, Dr. Blatt treated patients at the Prison and oversaw the treatment provided by Corizon's non-physician practitioners to Prison inmates.[6]

It appears the first of Mr. Charleston's many sick call requests occurred March 6, 2015 when Nurse Barbara Kitter (a Corizon agent) responded to Mr. Charleston's sick call request complaining of a sore throat and neck pain.[7]  Mr. Charleston complained his sore throat and neck pains lasted for three weeks.[8]  Nurse Kitter referred Mr. Charleston to a physician assistant for further evaluation.[9]  Corizon prescribed antibiotic amoxicillin.[10]  On March 9, 2015, Physician Assistant Constance Orji examined Mr. Charleston, suggested Mr. Charleston use a warm

2

compress on his neck if pain continued, and instructed Mr. Charleston to return if his symptoms worsened.[11]

On March 19, 2015, Mr. Charleston submitted another sick call request complaining of neck and throat pains.[12] Nurse Kristin Popelak examined Mr. Charleston the next day, instructed him to take Tylenol as needed, and to return if his symptoms worsened.[13]

On April 2, 2015, Mr. Charleston submitted a sick call request complaining of ongoing neck pain for the past month-and-a-half.[14] On April 3, 2015, Victor Kak, of unknown title, evaluated Mr. Charleston but did not note a major concern with Mr. Charleston's health.[15]

On May 5, 2015, Mr. Charleston submitted a sick call request again complaining of ongoing neck and throat pain for the past two months and pain in his left ear.[16] On May 6, 2015, Nurse Lisa Fauntleroy examined Mr. Charleston and suggested he follow up with a practitioner for chronic care.[17] On May 7, 2015, Nurse Orji again evaluated Mr. Charleston and noted his complaints of a sore throat for the past four months and ear pain for the past several weeks.[18] Nurse Orji instructed Mr. Charleston to take amoxicillin potassium claculanate, chlorpheniramine maleate, and Tylenol.[19]

Over two months later, Mr. Charleston submitted a sick call request complaining of what he believed to be an allergic reaction to medication, specifically ibuprofen, which he described as "eating away at the back of my throat" and causing him to cough up blood.[20] On July 9, 2015, Mr. Charleston submitted another sick call request again complaining of an allergic reaction to certain medication, explaining he is coughing up blood, and requested his throat be "properly looked at."[21]

On July 23, 2015, Physician Assistant Karen McKinney examined Mr. Charleston.[22] She noted Mr. Charleston's complaint of his sore throat lasting almost six months and the prescribed

medication did not alleviate his symptoms.[23]  PA McKinney noted a redness in his throat but labelled the assessment as "benign."[24]

On August 6, 2015, Mr. Charleston submitted a sick call request stating, "I have been having bad migraines I need to be seen tumors run in my family.  Tylenol isn't working the aching is constant."[25]  On August 9, 2015, an unknown Corizon provider examined Mr. Charleston.[26]  The provider gave Mr. Charleston Tylenol and instructed him to follow up if his symptoms worsen.[27]

On August 9, 2015, Mr. Charleston reported a headache to Nurse Popelak.  Corizon prescribed Tylenol.[28]

On August 15, 2015, Mr. Charleston submitted a sick call request stating, "I'm still bad having headaches & migraines I never received my medication.  I need to be checked out thoroughly.  I've been having this aching pain in my head for about 2 months now, tumors run in my family & I believe this aching pain is more serious then migraines & headaches its constantly getting worse."[29]

On August 16, 2015, Mr. Charleston submitted a sick call request stating, "I need to be seen I'm having throat pains, glands swollen, from an allergic reaction to the medicine given to me.  I need pain medicine, Tylenol.  I have G6PD so I can't take Ibuprofen, Aspirin, etc… I have been having this same problems things only gotten worse.  I keep feeling out these sick call slips & not being seen nor the proper treatment of getting look at thoroughly."[30]

On August 17, 2015, Mr. Charleston filled out another sick call request again complaining of worsening headaches.[31]  On August 19, 2015, Nurse Dulie Rene examined Mr. Charleston.[32]  Nurse Rene reported Mr. Charleston described his pain at a ten out of a ten point scale.[33]  The Prison prescribed Tylenol.[34]

On August 26, 2015, Mr. Charleston submitted a sick call request stating, "I'm still having these bad migraines & headaches. The Tylenol given to me did not work. The pain is constant I can't sleep it hurts when I try to rest my head on the left side. The slightest touch of my head causes me alot of pain. I need to be seen ASAP for brain cancer please get me the proper treatment I can't keep taking this pain its unbearable."[35] On August 27, 2015, Nurse Rene examined Mr. Charleston.[36] Mr. Charleston again described his pain at a ten out of ten.[37] Nurse Rene referred Mr. Charleston to a practitioner.[38]

On August 28, 2015, PA McKinney again examined Mr. Charleston.[39] Mr. Charleston complained of migraines lasting for the past one-and-a-half months.[40] Mr. Charleston explained the medication is not alleviating symptoms.[41] Mr. Charleston demanded a CT scan be performed.[42] PA McKinney diagnosed Mr. Charleston with a headache.[43] PA McKinney noted Mr. Charleston became argumentative when she did not provide the treatment he demanded.[44] PA McKinney instructed Mr. Charleston to return if his symptoms worsen or change.[45] Given Mr. Charleston's demand for a CT scan, PA McKinney sent an internal communication to Dr. Blatt requesting his input on the next steps.[46]

On September 2, 2015, PA McKinney again examined Mr. Charleston.[47] PA McKinney reported Mr. Charleston complained of a consistent headache lasting the last six weeks.[48] PA McKinney also reported Mr. Charleston demanded a CT scan.[49] PA McKinney submitted a telephone encounter form, an internal communication, to Dr. Blatt requesting Dr. Blatt's guidance on the next steps.[50] The same day, Dr. Blatt, without examining Mr. Charleston, referred Mr. Charleston to Corizon's chronic care physician Dr. Robin Clemons.[51]

On September 4, 2015, Mr. Charleston submitted another sick call request explaining, "I'm still having constant migraines & headaches I've been having this problem for 2 months

now I need to get looked at properly.  I'm afraid that I may have a tumor in my head."[52]  On September 7, 2015, Mr. Charleston submitted a sick call request stating, "I need to be seen thoroughly I have a serious issue that concerns my life.  I have a tumor in my head its no way that I should keep having migraines & headaches for the past two months everyday.  No medication has worked please can I get a cat scan for my head I have rights for getting the proper treatment why are my concerns being ignored?"[53]

On September 7, 2015, Mr. Charleston filled out an inmate grievance form.[54]  Mr. Charleston explained his issue with constant headaches and migraines and how the medication prescribed did not alleviate his symptoms.[55]  Mr. Charleston repeated his concern he had a tumor in his head.[56]  Mr. Charleston stated the nurses he met with ignored his concerns he had brain cancer and ignored his requests for a CT scan.[57]  In the "Action Requested by Inmate" section of the grievance form, Mr. Charleston pled, "Please can I just get a cat scan for my head I don't want to die my family is worried that things can get worst if I don't get the proper treatment.  All I'm asking for is a cat scan to see what wrong with me & why I'm having these migraines."[58]  The parties dispute whether Mr. Charleston actually submitted this September 7, 2015 grievance form.

On September 8, 2015, Mr. Charleston submitted another sick call request requesting treatment for his migraines.[59]  The same day, Nurse Popelak entered a progress note in response to Mr. Charleston's sick call requests.[60]  Nurse Popelak explained Mr. Charleston had been seen recently for the same issues and had an appointment scheduled with a chronic care physician pending.[61]  Nurse Popelak did not examine Mr. Charleston on September 8, 2015.[62]

On September 10, 2015, Mr. Charleston submitted a sick call request explaining, "I need my tooth pulled immediately I can't take these headaches & constant migraines everyday

anymore it feels like I may have a tumor in my head the migraines & headaches been going on for 2 months now I'm starting to spit out blood & its scaring me.  The whole left side of my face is in pain my jaw & my head!"[63]

### *Dr. Clemons' initial exam and continued sick call requests.*

On September 11, 2015, following Dr. Blatt's referral of Mr. Charleston to chronic care, Dr. Robin Clemons examined Mr. Charleston for the first time.[64]  Dr. Clemons noted Mr. Charleston complained of headaches for the past two months and the pain worsens when he eats and sleeps on his left side.[65]  Dr. Clemons also noted Mr. Charleston's belief Tylenol did not help him.[66]  Dr. Clemons examined Mr. Charleston's head, eyes, ears, oral cavity, throat, heart, and lungs.[67]  Dr. Clemons reported Mr. Charleston may have been experiencing migraines or may have had an issue with his temporomandibular joint in his jaw ("TMJ").[68]  Dr. Clemons diagnosed Mr. Charleston with headaches.[69]  Dr. Clemons also observed an infection in Mr. Charleston's left ear.[70]  Following her exam, Dr. Clemons prescribed Mr. Charleston propranolol and Tylenol in an attempt to decrease the frequency of Mr. Charleston's headaches.[71]  Dr. Clemons prescribed clindamycin to treat Mr. Charleston's ear infection.[72]  Dr. Clemons ordered a series of lab tests to rule out a possibility of a systemic infection causing Mr. Charleston's headaches.[73]  Finally, Dr. Clemons ordered x-ray tests on Mr. Charleston's skull and an x-ray test focusing on Mr. Charleston's TMJ to explore the potential cause of Mr. Charleston's headaches.[74]  Dr. Clemons ordered a follow up appointment with Mr. Charleston in four weeks.[75]  Dr. Clemons did not consider ordering a CT scan during her first examination of Mr. Charleston.[76]

Between September 11th and October 13th, Mr. Charleston did not submit sick call requests to the medical center.[77]

On October 14, 2015, Mr. Charleston submitted a sick call request explaining, "I'm still having these constant migraines & headaches everyday all day. I've taken all the medication prescribed to me as instructed. This problem only gotten worse & on top of that my neck & left ear has continuously been a problem as well. Please can I have a cat scan on my head I believe I have a brain tumor this is a life threatening issue please don't ignore my concerns."[78] On October 15, 2015, Nurse Marie Whatley examined Mr. Charleston.[79] Nurse Whatley noted Mr. Charleston felt pain he described as ten out of ten.[80] Mr. Charleston explained the Tylenol and other medications prescribed did not alleviate his symptoms and his headaches have been persistent for three months.[81] Nurse Whatley referred Mr. Charleston to chronic care and scheduled an appointment for October 22, 2015.[82]

On October 29, 2015, Mr. Charleston submitted a sick call request explaining he had not yet seen a physician as scheduled during his last visit and still experienced the same headaches and migraines.[83] Mr. Charleston also warned, "I keep filling out these sick call slips which seems to be getting ignored if I die in here because your nurses fail to schedule me for a cat scan on my head to see if I have a tumor then my family will have a major lawsuit please stop ignoring my health concerns."[84]

On October 30, 2015, Dr. Clemons saw Mr. Charleston for a follow up appointment, despite ordering a follow up appointment to occur on later than October 11, 2015.[85] During the examination, Mr. Charleston expressed concern he had a brain tumor.[86] Mr. Charleston also expressed concern about his symptoms lasting for nearly 6 months without improvement.[87] Dr. Clemons examined Mr. Charleston's head, eyes, ears, oral cavity, heart and lungs.[88] During her examination, Dr. Clemons learned the x-rays she ordered back on September 11 were not performed.[89] Dr. Clemons did not investigate why the Prison and Corizon did not obtain the x-

rays but she did re-order the x-rays to be performed.[90]  Dr. Clemons did not know Nurse Whatley

saw Mr. Charleston on October 15 at the time of the examination.[91]  Dr. Clemons diagnosed Mr.

Charleston with headaches and acute serous otitis media, fluid in the ear.[92]  In addition to re-

ordering the x-ray tests, Dr. Clemons stopped the prescription of propranolol, refilled the Tylenol

prescription, and prescribed Augmentin to address Mr. Charleston's ear condition.[93]  Dr.

Clemons scheduled a follow up appointment for four weeks.[94]

### Dr. Limberakis recommended a CT and MRI on November 5, 2015.

On November 3, 2015, Corizon performed the x-ray tests first ordered by Dr. Clemons on

September 11 but then re-ordered by Dr. Clemons on October 15.[95]  Corizon sent the images to

Bustleton Radiology, an off-site facility, for review.[96]  Dr. Anthony Limberakis, a radiologist

with Bustleton Radiology, reviewed Mr. Charleston's x-ray images.[97]  Dr. Limberakis

memorialized his conclusions in a November 5, 2015 report.[98]  Dr. Limberakis directed his

report to Dr. Blatt.[99]  Near the top of Dr. Limberakis's report, Dr. Limberakis wrote, "STAT

REPORT – PHYSICIAN ATTENTION REQUIRED."[100]  Dr. Limberakis concluded, "Adenoid

and prevertebral soft tissue enlargement for which clinical correlation and followup are advised;

a prevertebral soft tissue mass at C1 level is suggested and close followup is advised; CT or MRI

of the neck soft tissues is strongly recommended."[101]  Bustleton Radiology faxed Dr.

Limberakis's report to the Prison.[102]

Dr. Blatt received Dr. Limberakis's faxed report on November 5, 2015.[103]  Under

Corizon policy, Dr. Blatt received all x-ray reports to ensure timely delivery and review by the

appropriate person at Corizon.[104]  Corizon implemented this policy because not all physicians

worked at the Prison full-time but Dr. Blatt remained at the Prison full-time.[105]  Dr. Blatt read

Dr. Limberakis's report, including his conclusions strongly recommending further CT or MRI

testing.[106]  After reading the report, Dr. Blatt reviewed Mr. Charleston's patient chart and learned Dr. Clemons ordered the x-ray tests.[107]  Dr. Blatt crossed his name off of Dr. Limberakis's report and wrote Dr. Clemons name on the report.[108]  Dr. Blatt then walked the report down to Dr. Clemons and handed the report directly to Dr. Clemons.[109]  Dr. Blatt directed Dr. Clemons to follow up on the report.[110]  Dr. Blatt did not take a further step to ensure Dr. Clemons acted on Dr. Limberakis's recommendations.[111]

When handed Dr. Limberakis's report from Dr. Blatt, Dr. Clemons explained to Dr. Blatt she had an upcoming appointment with Mr. Charleston (at the end of November) and would discuss the x-ray results with Mr. Charleston during the appointment.[112]  Dr. Clemons testified she did not read the report in its entirety upon receiving it from Dr. Blatt.[113]  Dr. Clemons testified she only read the top portion of the report to identify the patient name.[114]  Dr. Clemons placed the report in her desk drawer.[115]  Dr. Limberakis's November 5 report remained in Dr. Clemons' desk drawer without further action.[116]

On November 8, 2015, Mr. Charleston arrived at the Prison medical center complaining of blood in his saliva.[117]  Licensed Practical Nurse Danielle McGettigan examined Mr. Charleston and instructed him to return if it happens again or the symptoms worsen.[118]

On November 13, 2015, Mr. Charleston submitted a sick call request stating, "I'm still having headaches and migraines every day all day.  This has been an ongoing problem since I 1st filled out a sick call request back in August.  I been having loss of appetite.  I don't eat, can't sleep.  I've taken every medication prescribed to me the Tylenol doesn't help.  For 3 months I've been having these headaches and migraines it only gotten worse.  Please can I have a cat scan on my head.  I'm worried that I may have a tumor."[119]

On November 14, 2015, in response to his sick call request, recently hired Nurse Anita Diorio examined Mr. Charleston.[120]  Mr. Charleston complained of cold sweats and coughing up blood.[121]  Concerned Mr. Charleston may have tonsillitis, Nurse Diorio brought Mr. Charleston to Dr. Clemons for an examination.[122]  Dr. Clemons testified she noticed Nurse Diorio's demeanor, tone and presentation evidenced Nurse Diorio "was very concerned" about Mr. Charleston's health.[123]  Dr. Clemons diagnosed Mr. Charleston with acute tonsillitis and hemoptysis.[124]  Dr. Clemons prescribed Augmentin and Tylenol, ordered lab tests and a chest x-ray.[125]  Despite having received Dr. Limberakis's November 5 x-ray report for nearly ten days, Dr. Clemons still did not review the results and did not discuss Dr. Limberakis's recommendations with Mr. Charleston on November 14 because she "forgot about" the report and x-rays.[126]  Dr. Limberakis's report remained in Dr. Clemons's desk drawer.

On November 15, 2015, Mr. Charleston returned to the Prison medical center and complained of a sore throat and coughing up blood.[127]  Nurse Diorio examined Mr. Charleston.[128]  Nurse Diorio noted Mr. Charleston seemed anxious.[129]  Nurse Diorio also noted Mr. Charleston presented with "tissue with dark red thick 1 cm blood lump."[130]  Nurse Diorio performed a general examination and described Mr. Charleston as "in no acute distress, well developed, well nourished."[131]  Nurse Diorio instructed Mr. Charleston to return if condition worsens.[132]  The same day Mr. Charleston also filled out a Request for Staff form requesting a meeting with a social worker.[133]  Mr. Charleston sought a social worker to discuss his concern of his improper medical treatment, medical providers not taking him seriously, his concern of a brain tumor, and his worsening symptoms.[134]  On the form Mr. Charleston also indicated the urgent nature of his concerns by checking off the "EMERGENCY" check box and circling the subheading "a matter of life or death, or serious bodily injury to any person."[135]  Neither party

adduced evidence suggesting whether Mr. Charleston actually submitted this form and whether Prison officials responded.

On November 16, 2015, Mr. Charleston returned to the Prison medical center complaining of continuing headaches.[136] Nurse Popelak noted Mr. Charleston recently visited Dr. Clemons regarding the same issue and Dr. Clemons ordered x-rays.[137] Nurse Popelak told Mr. Charleston he had a follow up appointment scheduled with Dr. Clemons, but did not provide treatment.[138]

On November 17, 2015, Mr. Charleston returned to the Prison medical center complaining of blurry vision with associated eye pain he rated as an eight out of ten.[139] Mr. Charleston also complained of dizziness for the past two days.[140] Mr. Charleston reported he had to strain to keep his left eye open.[141] Nurse Emmanuel Marinho did not mark any assessment or plan in response to Mr. Charleston's complaint in his progress note.[142]

On November 18, 2015, Mr. Charleston again returned to the Prison medical center complaining he spit up blood.[143] Nurse Mary Duffy provided Mr. Charleston with a septum to produce saliva.[144] Nurse Duffy noted Mr. Charleston produced a significant amount of clear saliva with "an insignificant tinge of red."[145] Mr. Charleston also reported of slight tenderness in his abdomen, but Nurse Duffy did not observe any swelling, bloating, or distention of Mr. Charleston's abdomen.[146] Nurse Duffy provided a second septum for Mr. Charleston to produce an additional sample when possible.[147] Nurse Duffy's disposition states, "PENDING A SIGNIFICANT SAMPLE OF SPUTUM SHOWING SIGNIFICANT BLOOD FOR TESTING."[148]

On November 19, 2015, Mr. Charleston again returned to the Prison medical center.[149] PA McKinney noted Mr. Charleston came in with varying and changing complaints.[150] Mr.

Charleston initially complained of spitting up blood.[151]  Mr. Charleston produced a blood tinged sample of saliva while at the medical center.[152]  Mr. Charleston initially denied having pain in his throat and ear and denied having issues with his vision.[153]  Mr. Charleston complained of limited head rotation movement, his inability to keep his eyes closed, and his inability to completely open his left eye.[154]  PA McKinney observed Mr. Charleston's conduct contradicted his complaints.[155]  PA McKinney believed Mr. Charleston suffered from acute serous otits media in his left ear and hypertrophy of his left nasal turbinate (swelling of an internal nose structure).[156] Considering his complaint medications were not helping alleviate his symptoms, PA McKinney told Mr. Charleston she would discuss alternative options with a physician.[157]  PA McKinney wrote Mr. Charleston became angry and refused to leave the medical area due to his dissatisfaction with his treatment.[158]  Once in the hallway outside the medical center, Mr. Charleston began yelling out additional health concerns including his headaches and double vision.[159]  PA McKinney noted Mr. Charleston visited with Dr. Clemons on October 30th and November 14th and had a follow up pending since November 18th.[160]

PA McKinney sought Dr. Blatt for advisement but Dr. Blatt was not in the office.[161]  PA McKinney sent Dr. Blatt an internal communication regarding Mr. Charleston.[162]  PA McKinney also spoke with Dr. Clemons but did not note the content of their conversation.[163]  On November 20, 2015, Dr. Blatt responded to PA McKinney's communication stating, "being followed by Dr. Clemons."[164]

On November 21, 2015, Mr. Charleston arrived at the Prison medical center on a stretcher complaining of blurry and double vision and a pain behind his left eye.[165]  Mr. Charleston complained the problem has lasted for weeks and explained he felt like he had an aneurysm.[166]  Nurse Christina Marshall consulted with Nurse Practitioner Roseann Green on

how to treat Mr. Charleston.[167]  Nurse Green ordered Mr. Charleston be given Benadryl.[168]

Nurse Green did not review any of Mr. Charleston's sick call notes or lab or diagnostic studies

before ordering the Benadryl.[169]  The same day, Mr. Charleston filed an inmate grievance

detailing his concerns about his lack of proper medical treatment, his fear he has a brain tumor,

his fear of dying in prison, and his repeated requests for a CT scan.[170]

On November 22, 2015, Mr. Charleston called his family to discuss his medical issues.[171]

Another inmate became agitated about the duration Mr. Charleston used the telephone and Mr.

Charleston and the other inmate engaged in a physical altercation.[172]  A Prison official ordered

Mr. Charleston be sent to solitary confinement and the same day Corizon employee Evelyn Rosa

medically cleared Mr. Charleston for solitary confinement.[173]

On November 23, 2015, Nurse Practitioner Charlotte Hamilton examined Mr.

Charleston.[174]  Mr. Charleston complained of headaches and blurred vision.[175]  Nurse

Practitioner Hamilton referred Mr. Charleston to an optometrist, Dr. Tyler Mills.[176]

On November 25, 2015, optometrist Dr. Mills examined Mr. Charleston under Nurse

Practitioner Hamilton's referral.[177]  For reasons not explained, Dr. Mills had access to and

reviewed Dr. Limberakis's November 5 report while examining Mr. Charleston.[178]  Before Dr.

Mills's review of Dr. Limberakis's report, no other medical provider reviewed the report or

informed Mr. Charleston of the x-ray results, despite Corizon having received the report twenty

days before.  Dr. Mills diagnosed Mr. Charleston with paralytic strabismus, sixth or abducens

nerve palsy (dysfunction of a cranial nerve).[179]  Dr. Mills recommended urgent MRIs of Mr.

Charleston's head and orbits.[180]  The same day Dr. Mills examined Mr. Charleston, he emailed

Dr. Clemons and Corizon's off-site scheduler to explain his findings and to facilitate the

scheduling of the urgent MRI.[181]  Dr. Clemons testified she never read Dr. Mills's email until the

day of her deposition.[182]  Dr. Clemons testified she did not regularly check her Corizon email and never read Dr. Mills's email while working at Corizon.[183]  On December 1, 2015, Dr. Mills also emailed Dr. Blatt to facilitate the scheduling of the MRI.[184]

On December 1, 2015, Warden Michelle Farrell approved Deputy Warden Frederick Abello's findings of fact and recommendation in response to Mr. Charleston's recently filed grievance.[185]  Deputy Warden Abello found Mr. Charleston received treatment from numerous providers at the medical center in November and by an off-site optometrist.[186]  Under recommended action, Deputy Warden Abello wrote, "Inmate is currently receiving medical treatment."[187]  The findings form includes an area for the inmate to sign accepting the recommended action.  Mr. Charleston refused to sign the form.[188]

On December 3, 2015, despite Dr. Mills's November 25 order for urgent MRIs and his efforts to facilitate scheduling, Corizon scheduled an MRI for almost two months later on January 31, 2016 at Temple University Hospital.[189]  Dr. Blatt received the same email and the same day evaluated Mr. Charleston.[190]  Dr. Blatt identified the same nerve issue identified by Dr. Mills and immediately referred Mr. Charleston to Temple University Hospital Emergency Department for evaluation.[191]  The same day, Temple Hospital performed a CT scan on Mr. Charleston's head.  The CT scan of his head identified a soft tissue mass.[192]

*Mr. Charleston learns of his cancer on December 5.*

Late night on December 3 into the early morning of December 4, 2015, Robert Bryan, DO and Joel Passer, MD at Temple ordered a CT scan and MRI on Mr. Charleston's head.[193]  The MRI and CT scan results identified a mass "highly suspicious for nasopharyngeal carcinoma."[194]  The biopsy and pathology analysis performed on December 5, 2015 confirmed Mr. Charleston suffered from Stage IV nasopharyngeal cancer.[195]

Shortly after Mr. Charleston's December 5 diagnosis, Dr. Eke Kalu, Corizon's Regional Medical Director met with Dr. Clemons.[196]  Dr. Kalu explained to Dr. Clemons she could either put in her resignation or be terminated for her treatment of Mr. Charleston.[197]

### Correctional officers observe Mr. Charleston's condition.

While under Corizon's care and before Mr. Charleston's cancer diagnosis, Correctional Officer Sharonna Boyer, among others, observed Mr. Charleston's discomfort on multiple occasions while in his cell.[198]  Officer Boyer observed Mr. Charleston cover his head in a towel and block his window with his lunch tray to block the sunlight and prevent the irritation the light caused him.[199]  On several occasions Mr. Charleston told Officer Boyer he felt he had a brain aneurysm.[200]  And on at least one occasion Mr. Charleston told Officer Boyer he felt he did not receive proper medical treatment from Corizon.[201]  Officer Boyer became so concerned she spoke to Sergeant Staci Henderson and ordered Mr. Charleston be taken by stretcher to the Prison medical center.[202]  Angelique Williams, another correctional officer, also sent Mr. Charleston to the Prison medical center after observing Mr. Charleston's discomfort on a separate occasion.[203]

On an unspecified date, Officer Williams observed Mr. Charleston return to his cell from the medical center crying.[204]  Officer Williams notified Sergeant Henderson and Sergeant Henderson met with Mr. Charleston.[205]  Mr. Charleston showed Sergeant Henderson some sick call requests and stated he had been examined by several doctors.[206]  Mr. Charleston cried while meeting with Sergeant Henderson.[207]  Sergeant Henderson testified, "I could see in his face that his head was really hurting him." And "I could see in his eyes.  The whites of his eyes was really red and he just looked really sick to me."[208]  Sergeant Henderson decided to escort Mr. Charleston back to the Prison medical center.[209]  Upon arrival, a medical staff employee,

identified as PA McKinney by Mr. Charleston during his deposition, approached Sergeant Henderson and Mr. Charleston.[210]   PA McKinney told Sergeant Henderson she treated Mr. Charleston, Mr. Charleston should not be returning to the Prison medical center, and the medical team could not do anything further for Mr. Charleston.[211]   Sergeant Henderson described PA McKinney's demeanor as "horrible" and "nasty."[212]   After a short conversation between Sergeant Henderson and PA McKinney, Sergeant Henderson escorted Mr. Charleston back to his cell without further treatment.[213]

## II.   Analysis

Mr. Charleston, now released from state custody, sues the City of Philadelphia, Warden Farrell, Deputy Warden Abello, Corizon, Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse McGettigan, Nurse Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, PA Orji, Elmeada Frias, Dr. Blatt, and Dr. Clemons.   Mr. Charleston challenges the adequacy of the treatment and claims the Prison's medical and non-medical staff's conduct delayed his ultimate cancer diagnosis.   Mr. Charleston seeks damages for medical negligence, intentional infliction of emotional distress, and claims arising under the Eighth and Fourteenth Amendments against all Defendants.

The City of Philadelphia, Warden Farrell, Deputy Warden, Dr. Blatt, and Ms. Frias move for summary judgment on all claims.   The remaining Defendants do not challenge the negligence claim at this stage but move to partially dismiss Mr. Charleston's intentional infliction of emotional distress, Eighth Amendment and Fourteenth Amendment claims and punitive damages demand.[214]

The City and Corizon argue Mr. Charleston failed to adduce evidence of a policy or custom violated to support a constitutional claim against them for their employees' conduct

under *Monell v. Dept. of Soc. Servs.*[215] Corizon employees, other than Dr. Blatt and Ms. Frias, acknowledge there is triable question as to whether they acted negligently, but argue their treatment of Mr. Charleston did not rise to the level of deliberate indifference to support a constitutional claim. All Defendants argue they did not engage in extreme or outrageous conduct to support an intentional infliction of emotional distress claim. All Defendants argue the evidence adduced does not support Mr. Charleston's claim for punitive damages.

**A. We grant summary judgment dismissing the Fourteenth Amendment claim against Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse McGettigan, Nurse Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, and PA Orji.**

Mr. Charleston brings Eighth and Fourteenth Amendment claims against all Defendants claiming all Defendants acted with deliberate indifference towards his serious medical needs. Mr. Charleston claims all Defendants delayed and denied him proper medical care exacerbating his medical condition and significantly reducing his chance of recovery. All individuals, except Warden Farrell and Abello, argue Mr. Charleston has not adduced evidence sufficient for a reasonable jury to find they acted with deliberate indifference.[216] Warden Farrell and Deputy Warden Abello argue Mr. Charleston failed to adduce evidence of their personal involvement in the alleged deprivation of his constitutional right.

A state actor is liable for depriving a constitutional right to an injured prisoner.[217] No party challenges their status as a state actor. The parties dispute whether a violation of Mr. Charleston's constitutional rights occurred in relation to the medical care provided to Mr. Charleston as a pretrial detainee.

A pretrial detainee's claim for inadequate medical care arises under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment.[218] The Fourteenth Amendment offers pretrial detainee rights "at least as great as the Eighth Amendment protections

available to a convicted prisoner."[219]  Our court of appeals instructs a claim for inadequate medical care by a pretrial detainee under the Fourteenth Amendment is analyzed under the same standard applied in Eighth Amendment cruel and unusual punishment claims brought by convicted prisoners.[220]  To establish a violation of Mr. Charleston's constitutional right to adequate medical care, the evidence must show (1) a serious medical need, and (2) acts or omissions by prison officials indicating deliberate indifference to the pretrial detainee's need.[221]

Deliberate indifference requires more than negligence or medical malpractice.[222]  But deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."[223]  Deliberate indifference requires the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[224]  A mere disagreement between inmate and medical provider regarding proper medical treatment alone does not support a deliberate indifference claim.[225]  Our court of appeals has found deliberate indifference "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."[226]  "In situations involving claims for inadequate medical care, we have found deliberate indifference in situations where there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence."[227]

Negligent diagnosis by prison medical providers does not support a claim of deliberate indifference.[228]  "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in

the diagnosis and treatment of prisoners."[229]  Where there is a dispute regarding the adequacy of treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."[230]  "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."[231]

Non-medical prison officials may not be found deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."[232]  In *Spruill v. Gillis*, our court of appeals explained a non-medical prison official "will generally be justified in believing that the prisoner is in capable hands" if the prisoner is "under the care of medical experts."[233]  Absent reason to believe or actual knowledge prison medical staff are mistreating or failing to treat an inmate, a non-medical official will not be found to have acted with deliberate indifference.[234]

Our court of appeals recently extended the same protection outlined in *Spruill* to non-physician prison medical staff.  In *Pearson v. Prison Health Serv.*, the court explained, "Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' so long as the nurse has no discernable basis to question the physician's medical judgment."[235]

To the extent Mr. Charleston seeks to hold supervisory officials liable, such officials cannot be held liable for the wrongs of others, as is the case under the doctrine of *respondeat superior*.[236]  In other words, a supervisory official's liability cannot be based merely on an employer-employee relationship.[237]  Rather, to hold a supervisor liable for deliberate

indifference, Mr. Charleston must adduce evidence the supervisor: (a) directly participated in violating his rights; (b) directed others to violate his rights; or (c) knew of and acquiesced in his subordinates' violations of his rights.[238]  Policymakers may also be liable under Section 1983 when the policymaker, acting with deliberate indifference to the consequences, established a policy, practice, or custom which caused a constitutional harm.[239]

Mr. Charleston sues three categories of defendants (1) medical personnel, (2) non-medical prison officials, and (3) supervisory employees.  Given the nuances in constitutional law as applied to these three categories of individuals and mindful Mr. Charleston must show each person's liability, we address each category separately.

### 1. Mr. Charleston failed to adduce evidence of deliberate indifference by Corizon treating medical staff except as to Drs. Blatt and Clemons.

Mr. Charleston sues his treating medical personnel claiming they deliberately ignored his serious medical needs.  Mr. Charleston received treatment from numerous nurses, nurse practitioners, licensed practical nurses, physician assistants, and physicians.  A proper dividing line in analyzing each medical personnel's conduct is care received before Corizon received Dr. Limberakis's x-ray analysis on November 5, 2015 and care received after.

Dr. Limberakis's report identified evidence of a soft tissue mass near the upper part of Mr. Charleston's neck near the base of his skull.  This is the first piece of medical evidence adduced identifying a potential tumor and a new cause of Mr. Charleston's headaches and migraines, throat pains, ear pains, and bleeding issues which at the time of the report lasted for at least several months.  The record to date confirms no Corizon medical provider considered the possibility of a tumor causing Mr. Charleston's symptoms or exercised professional medical judgment in ruling out the possibility of a tumor before Dr. Limberakis completed and submitted his report to Corizon.

### a. Mr. Charleston's treatment before November 5, 2015.

Three medical providers treated Mr. Charleston before November 5, 2015: PA Orji, Nurse Rene, and Nurse Whatley.[240] PA Orji treated Mr. Charleston on March 9 and May 7, 2015.[241] Nurse Rene treated Mr. Charleston on August 19 and August 27, 2015.[242] Nurse Whatley treated Mr. Charleston on October 15, 2015.[243]

PA Orji treated Mr. Charleston in response to his first sick call request. Mr. Charleston complained of a sore throat, neck, and ear.[244] PA Orji examined Mr. Charleston's head, eyes, ears, nose, oral cavity, throat, neck, lymph nodes, skin, heart, lungs, abdomen, and extremities, recommended a warm compress on his neck to calm the soreness, and instructed Mr. Charleston to return should his symptoms worsen.[245] PA Orji again examined Mr. Charleston two months later and believed he suffered from acute allergic serous otitis media and prescribed several medications.[246] PA Orji examined and treated Mr. Charleston on both visits. During PA Orji's second examination, she took a different approach and instructed Mr. Charleston take new medications. PA Orji's failure to recognize the symptoms Mr. Charleston experienced as symptoms of nasopharyngeal cancer and failure to diagnose Mr. Charleston's cancer on these dates does not alone constitute deliberate indifference.[247] There is a triable issue of fact of whether PA Orji's conduct constituted medical negligence, but negligence alone is insufficient to support a Fourteenth Amendment claim. Mr. Charleston does not adduce evidence PA Orji knew of facts from which the inference could be drawn a substantial risk of serious harm existed and PA Orji ignored the risk.

Mr. Charleston's constitutional claim against Nurse Rene must also fail. Nurse Rene responded to Mr. Charleston's sick calls in August complaining of continued headaches and requests for Tylenol. On August 19, 2015, Nurse Rene examined Mr. Charleston and prescribed

him Tylenol.  On August 27, 2015, in response to Mr. Charleston's sick call identifying the Tylenol did not help, Nurse Rene referred Mr. Charleston to a practitioner.  Nurse Rene's referral started the chain of events which ultimately lead to Mr. Charleston's referral to a chronic care physician.  Nurse Rene did not ignore Mr. Charleston's complaints or refuse him treatment. Nurse Rene responded to Mr. Charleston's sick calls, treated him, and referred him to a practitioner when she recognized the Tylenol she gave Mr. Charleston did not alleviate his symptoms.  Mr. Charleston failed to adduce evidence Nurse Rene knew of facts from which the inference could be drawn a substantial risk of serious harm existed and Nurse Rene ignored the risk.

Nurse Whatley examined Mr. Charleston after an October 14th sick call request complaining of continuing headaches and requesting a CT scan.  At the time Nurse Whatley examined Mr. Charleston, Mr. Charleston received treatment under Dr. Clemons's care.  Given the frequency of Mr. Charleston's recent sick call requests, Nurse Whatley referred him back to chronic care and scheduled an appointment for one week later.  Nurse Whatley did not refuse to examine Mr. Charleston.  The fact Nurse Whatley did not provide Mr. Charleston a CT scan as requested is not sufficient to establish deliberate indifference necessary for a constitutional claim.[248]  Mr. Charleston does not adduce evidence Nurse Whatley had a discernable basis to question Dr. Clemons continued treatment.  Mr. Charleston does not adduce evidence Nurse Whatley knew of facts from which the inference could be drawn a substantial risk of serious harm existed and Nurse Whatley ignored the risk.

Nurse Rene, Nurse Whatley, and PA Orji did not have the benefit of reviewing Dr. Limberakis's report before offering Mr. Charleston treatment.  Mr. Charleston has not adduced

evidence these providers knew of a substantial risk of cancer and ignored the risk. He cannot state a constitutional claim against these providers.

Nurse Popelak, PA McKinney, and Dr. Clemons also provided treatment for Mr. Charleston before November 5, 2015. In response to his sick call requests, Nurse Popelak examined Mr. Charleston and instructed he take Tylenol. Nurse Popelak also noted Mr. Charleston had an upcoming appointment with Dr. Clemons within a few days of her examination. PA McKinney examined Mr. Charleston's throat and assessed the soreness observed as "benign." PA McKinney next examined Mr. Charleston over a month later. Mr. Charleston complained his headaches continued and demanded a CT scan be performed. In response, PA McKinney contacted Dr. Blatt and Dr. Blatt referred Mr. Charleston to a chronic care physician, Dr. Clemons. Dr. Clemons examined Mr. Charleston in September 2015, prescribed medication, ordered lab tests be performed, and ordered x-rays for Mr. Charleston's skull. Dr. Clemons examined Mr. Charleston next on October 30, 2015. She discovered the unidentified Corizon employee responsible for taking the x-ray images did not perform the x-ray study as she ordered. Dr. Clemons re-ordered the x-ray images. On November 3, 2015, an unidentified Corizon employee completed Mr. Charleston's x-ray study.

Mr. Charleston failed to adduce evidence Nurse Popelak, PA McKinney and Dr. Clemons acted with deliberate indifference towards a serious medical need before November 5, 2015. These providers responded to his sick call requests, prescribed medications, performed examinations, consulted with physicians, and ordered diagnostic tests. The fact Mr. Charleston disagreed with the course of action taken by the medical staff does not establish deliberate indifference.[249]

This is not a case where medical staff refused to provide Mr. Charleston treatment. Rather, this is a challenge to the adequacy of care. Although the medical staff's failure to recognize, diagnose, and treat Mr. Charleston's cancer during this time period may have been negligent, Mr. Charleston fails to adduce evidence these providers were aware of a substantial risk of serious harm and ignored the risk.

**b. Mr. Charleston's treatment on or after November 5, 2015.**

Nurse Popelak, Nurse Marshall, Nurse Duffy, Nurse Diorio, Licensed Practical Nurse McGettigan, Nurse Practitioner Hamilton, Nurse Practitioner Green, PA McKinney, Dr. Clemons, and Dr. Blatt treated Mr. Charleston on or after receiving Dr. Limberakis's report no later than November 5, 2015. Dr. Limberakis's report identified a potential soft tissue mass in Mr. Charleston's head. Dr. Limberakis's report identified a potential serious medical issue, urged a physician to timely review his findings, and strongly recommended Mr. Charleston receive further CT or MRI tests. Although the parties do not dispute Dr. Blatt received the report, handed the report to Dr. Clemons, and Dr. Clemons placed the report in her desk drawer, Dr. Mills, an off-site optometrist, had access to the report while examining Mr. Charleston on November 25, 2015. Dr. Mills incorporated Dr. Limberakis's impressions into his own report and strongly urged the medical staff at Corizon perform a MRI and CT scan. The fact Dr. Mills had access to the report during his evaluation suggests at some point between Corizon receiving Dr. Limberakis's report on November 5, 2015 and Dr. Mills reviewing the report and evaluating Mr. Charleston on November 25, 2015, Mr. Charleston's medical file at Corizon included the same report. A reasonable juror could infer Mr. Charleston's treating medical professionals could have had the opportunity to review Dr. Limberakis's report in preparation for or while

treating Mr. Charleston in triage, sick call examinations, or scheduled appointments after November 5, 2015.

Dr. Blatt and Dr. Mills are the only two medical providers reviewing Dr. Limberakis's report before Mr. Charleston's December 5, 2015 cancer diagnosis. Dr. Blatt admitted to reading Dr. Limberakis's report in its entirety. An issue of fact exists regarding steps Corizon required Dr. Blatt take after receiving and reviewing a diagnostic report. Dr. Blatt testified he only had to identify the physician who ordered the diagnostic testing and the deliver the report to the ordering physician.[250] Corizon's Regional Medical Director Dr. Kalu disagrees with Dr. Blatt and testified as the Site Medical Director, Corizon policy required Dr. Blatt perform a clinical correlation of the report and take further steps deemed appropriate using his professional medical judgment, such as ordering further diagnostic tests as recommended by the report.[251] Dr. Kalu testified he did not know Dr. Blatt did not perform these tasks.[252] We do not have a written policy as part of the summary judgment record to verify either account. A reasonable jury could find Dr. Blatt had the obligation to take the next steps in analyzing Dr. Limberakis's report against Mr. Charleston's medical history and treatment plan and determine next appropriate steps, including determining the necessity of further diagnostic testing.

This is not a case where the medical provider exercised professional medical judgment in response to newly obtained medical information. Dr. Blatt did not exercise professional medical judgment at all with respect to the impressions and recommendations in Dr. Limberakis's report. After reading the report, Dr. Blatt simply crossed his name off the report, wrote Dr. Clemons's name on the report, and directed Dr. Clemons review and take necessary steps. In fact, Dr. Blatt admitted he gave the report to Dr. Clemons with the expectation *she* would exercise her professional medical judgment to determine next steps in Mr. Charleston's treatment plan.[253] Dr.

Blatt may have exercised administrative or managerial judgment in his decision making on November 5, but Dr. Blatt did not exercise medical judgment in reviewing the contents of Dr. Limberakis's report. Given Dr. Blatt's awareness of medical evidence suggesting a serious medical issue but failed to exercise his professional medical judgment with respect to Dr. Limberakis's report, a reasonable jury could find Dr. Blatt acted with deliberate indifference to Mr. Charleston's serious medical needs.

Dr. Clemons received Dr. Limberakis's report directly from Dr. Blatt. Dr. Blatt instructed her to follow up on the report. Dr. Clemons put the report to the side for review before her upcoming appointment with Mr. Charleston. Dr. Clemons claims she never reviewed Dr. Limberakis's report in its entirety before Mr. Charleston's cancer diagnosis. Dr. Clemons admits she did read part of the report in order to identify Mr. Charleston as the relevant patient.[254] Given Dr. Clemons admits she received the report directly from Dr. Blatt and admits to having read some of the report, a reasonable jury could find Dr. Clemons was aware of Mr. Charleston's serious medical needs. Similar to Dr. Blatt, Dr. Clemons did not exercise professional medical judgment with respect to the impressions outlined in Dr. Limberakis's report. Dr. Clemons claims she forgot about the report after receiving it on November 5th. Given the report identified a new potential and serious medical cause of Mr. Charleston's continuous and worsening symptoms and Dr. Clemons failed to act on the report for a non-medical reason, a reasonably jury could find Dr. Clemons acted with deliberate indifference towards Mr. Charleston's serious medical need.

After November 5, 2015, Mr. Charleston received care from chronic care physician Dr. Clemons. Absent a discernable basis to question Dr. Clemons' medical judgment, non-physicians treating Mr. Charleston after November 5, 2015 could justifiably believe Mr.

Charleston "[was] in capable hands."[255]   Nurse Popelak, Nurse Marshall, Nurse Duffy, Nurse

Diorio, Licensed Practical Nurse McGettigan, Nurse Practitioner Hamilton, and Nurse

Practitioner Green provided care to Mr. Charleston after November 5, 2015.   Mr. Charleston

does not adduce evidence these nurses had a discernable basis to question Dr. Clemons' medical

judgment in treating Mr. Charleston.   Even assuming these nurses identified Dr. Limberakis's

report in Mr. Charleston's medical file, Mr. Charleston does not adduce evidence these nurses

knew or had reason to believe Dr. Clemons did not review and exercise her professional medical

judgment relating to Dr. Limberakis's impressions.   Reviewing the medical evidence and sick

call notes in the record, we cannot identify a complaint made by Mr. Charleston and received by

Prison medical staff regarding a failure of medical staff to review or follow up on the x-ray

images performed.   Absent evidence identifying a discernable basis for these nurses to question

Dr. Clemons' medical judgment, the nurses were justified in believing Mr. Charleston was "in

good hands."

     Similar to the nurses, Mr. Charleston failed to adduce evidence PA McKinney had a

discernable basis to question Dr. Clemons' medical judgment.   Mr. Charleston does not adduce

evidence PA McKinney knew or had reason to believe Dr. Clemons did not review or follow up

with Mr. Charleston regarding Dr. Limberakis's report.   But Mr. Charleston adduced evidence of

a confrontation between PA McKinney and Sergeant Henderson regarding Mr. Charleston's

symptoms observed by correctional officers.   We do not know when this confrontation

happened.   But we do know the confrontation did take place shortly after Mr. Charleston

received treatment at the Prison medical center the same day.[256]   PA McKinney explained to

Sergeant Henderson Mr. Charleston received treatment and she could not do anything further for

him.   Again Mr. Charleston does not adduce evidence he presented issues different from those

addressed earlier in the day, complained he did not receive appropriate medical treatment, or made PA McKinney aware of a substantial risk of serious harm.

We grant summary judgment dismissing Mr. Charleston's Fourteenth Amendment claim against Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse McGettigan, Nurse Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, and PA Orji. We deny summary judgment on Mr. Charleston's Fourteenth Amendment claim against Dr. Blatt and Dr. Clemons.

### 2. Mr. Charleston failed to adduce evidence to support a constitutional claim against supervisor Ms. Frias.

Mr. Charleston may establish a claim against a supervisory employee in only limited circumstances. Ms. Frias argues there are no facts supporting Mr. Charleston's claim against her. Mr. Charleston does not address Ms. Frias's argument in his response brief. There is no evidence of record identifying Ms. Frias's personal involvement in Mr. Charleston's treatment. Ms. Frias acted as the Prison's Health Services Administrator.[257] Ms. Frias does not have medical training and served Corizon as an administrator.[258] Ms. Frias never received an inmate grievance from Mr. Charleston.[259] Mr. Charleston failed to adduce evidence Ms. Frias participated in the other Defendants' conduct, directed others to violate Mr. Charleston's rights, or knew of and acquiesced in her subordinate's violation of Mr. Charleston's rights. Mr. Charleston adduced evidence Ms. Frias changed the staffing rotation of nurses at the medical center.[260] But Mr. Charleston does not adduce evidence for a reasonable juror to conclude Ms. Frias acted with deliberate indifference in implementing this change. Ms. Frias testified she created a rotation of nurses to handle sick calls so all nurses would have experience in handling sick calls.[261] We grant summary judgment dismissing Mr. Charleston's Fourteenth Amendment claim against Ms. Frias.

### 3. Issues of fact require we deny Warden Farrell's and Deputy Warden Abello's motion for summary judgment on the constitutional claim.

Warden Farrell and Deputy Warden Abello argue Mr. Charleston failed to adduce evidence of their personal involvement in his alleged deprivation of his Fourteenth Amendment right. Warden Farrell and Deputy Warden Abello must review and respond to inmate grievances.[262] There is an issue of fact whether Mr. Charleston submitted a grievance on September 7, 2015 complaining of headaches, claiming medical providers are overlooking the possibility of brain cancer, and requesting a CT scan be performed. The parties agree Mr. Charleston completed a grievance on September 7, 2015.[263] Two prison officials also testified to having personally delivered Mr. Charleston's grievances directly to the warden's office out of concern for Mr. Charleston's health and to ensure a timely investigation and response.[264]

But the City, Warden Farrell and Deputy Warden Abello argue they never received the grievance because the grievance form did not have an assigned "G" number, it could not be found in Mr. Charleston's inmate file, and it did not get logged in the grievance log book.[265] Warden Abello testified to never having received the grievance.[266] Given the serious nature and subject matter of Mr. Charleston's grievance, Deputy Warden Abello testified he would remember reading the grievance today had he done so in September 2015.[267] Deputy Warden Abello also testified if he had received Mr. Charleston's September 7th grievance, he would have personally addressed the situation by walking the grievance down to the Prison medical center and ensuring Mr. Charleston be examined by someone at the medical center immediately.[268] We do not have evidence of whether Warden Farrell, Deputy Warden Abello, or any other prison official responded to the September 7th grievance, if filed. The next grievance form of record filed by Mr. Charleston is in late November 2015 raising similar concerns to the September 7th

grievance. Warden Farrell Deputy and Warden Abello responded to this grievance finding Mr. Charleston received medical treatment from a physician.

These are questions of credibility left to the jury. Mr. Charleston adduced evidence of Warden Farrell and Deputy Warden Abello's personal involvement in the alleged deprivation of his due process rights. Mr. Charleston adduced the grievance form at issue and at least two Prison officials testified to having personally delivered multiple grievance forms to the warden's office. We do not know what grievances the officials delivered or on what dates. A reasonable jury could find Mr. Charleston submitted the grievance form on September 7th and Warden Farrell and Deputy Warden Abello ignored the grievance. A reasonable jury could find Warden Farrell and Deputy Warden Abello had reason to believe the medical staff at Corizon were mistreating or failing to treat Mr. Charleston's serious medical needs. We deny Warden Farrell and Warden Abello's motion for summary judgment on Mr. Charleston's Fourteenth Amendment claim.

### B. We grant the City's motion for summary judgment but deny Corizon's motion for summary judgment on Mr. Charleston's *Monell* claim.

Mr. Charleston seeks to hold Corizon and the City liable for the deliberate indifference of its employees towards his medical needs. Mr. Charleston brings his claim against Corizon and the City under Section 1983.[269] In Mr. Charleston's Second Amended Complaint, he alleges Corizon and the City implemented policies, customs and practices including: deliberately disregarding Mr. Charleston's serious needs; refusing necessary medical treatment to maximize savings at the expense of adequate care; failing to implement procedures to ensure adequate review of inmate medical issues; denying medical treatment for non-medical reasons; failing to coordinate among medical staff; and ignoring physicians orders and inmate complaints.

Corizon argues Mr. Charleston does not adduce evidence of a policy, practice, or custom which caused a constitutional violation to support a *Monell* claim.

Corizon and the City cannot be held liable for the acts of its employees under a theory of *respondeat superior*.[270] To impose liability on a local governmental entity under Section 1983, Mr. Charleston must establish "(1) [he] possessed a constitutional right of which [he] was deprived; (2) the municipality had a policy [or custom]; the policy [or custom] 'amounted to deliberate indifference' to the plaintiff's constitutional right; and (4) the policy [or custom] was the 'moving force behind the constitutional violation.'"[271] A policy is made "when a decision maker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."[272] A custom is an act not formally approved by the appropriate decision maker but "is so widespread as to have the force of law."[273]

There are three situations where a government employee's acts may be deemed the result of a policy, practice, or custom: (1) the appropriate officer or entity creates a generally applicable policy and the subsequent act at issue is an implementation of the policy; (2) no rule is announced as policy but federal law is violated by the policymaker itself; and (3) the policymaker fails to act affirmatively, though the need to take action is so obvious and the inadequacy of existing practices is so likely to result in the infringement of a constitutional right, the policymaker can reasonably be deemed deliberately indifferent.[274]

1. **Mr. Charleston failed to adduce evidence of a City policy, custom or practice under *Monell*.**

Mr. Charleston does not address the City's argument he failed to adduce evidence of a policy or custom of the City ignoring inmate grievances. But in Mr. Charleston's response to the City's offered statement of undisputed fact Mr. Charleston did not adduce evidence of a policy or

custom, Mr. Charleston cites the same facts he cited in opposition to Warden Farrell and Deputy Warden Abello's personal involvement argument.

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."[275] Evidence of Warden Farrell and Deputy Warden Abello's failure to respond to the September 7th grievance alone is insufficient for a jury to conclude the City implemented a policy or custom of ignoring inmate grievances. Mr. Charleston does not adduce evidence the single failure to respond to his September 7th grievance "was caused by an existing unconstitutional policy." We have no evidence of any other grievance being mishandled or ignored. Mr. Charleston failed to adduce evidence of a policy or custom implemented by the City to ignore inmate grievances. Further, Mr. Charleston failed to adduce evidence whether Warden Farrell and Deputy Warden Abello's were policymakers at CFCF. Mr. Charleston failed to adduce evidence to support his *Monell* claim against the City. We grant the City's motion for summary judgment against Mr. Charleston's *Monell* claim.

### 2. Issues of fact preclude summary judgment against Mr. Charleston's *Monell* claim against Corizon.

Corizon's argues Mr. Charleston failed to adduce evidence of a Corizon policy or custom which caused a violation of his constitutional rights. Corizon argues isolated evidence of Mr. Charleston's medical treatment alone is insufficient to establish a policy or custom under *Monell*. Mr. Charleston does not address Corizon's argument in his responding brief. But in Mr. Charleston's response to Corizon's offered statement of undisputed fact he failed to adduce evidence of the policies or customs asserted in his Second Amendment Complaint, Mr. Charleston offers three policies.[276] First, Mr. Charleston asserts Dr. Blatt created a policy,

contrary to what Regional Director Dr. Kalu believed to be Corizon's actual policy, of not exercising his medical judgment or conducting recommended clinical correlation or followup to x-ray studies mailed to Corizon.[277]   Rather, he found the physician who ordered the study and delivered the results to the physician.[278]   Second, Mr. Charleston claims Ms. Frias changed the procedure for how nurses handled sick calls from limiting the responsibility to one or two nurses to a rotation of nurses.[279]   Mr. Charleston asserts this change in policy foreclosed any possibility for continuity of care.[280]   Third, Mr. Charleston claims medical providers at Corizon had a practice of not reviewing sick call notes.[281]

Mr. Charleston adduced sufficient evidence for a reasonable jury to find Dr. Blatt served as a policymaker at Corizon while acting as Site Medical Director.  Dr. Blatt testified he acted as the "top person in charge" of the medical center at CFCF.[282]   Dr. Blatt testified Dr. Kalu developed policies and procedures for Corizon.[283]   But Dr. Blatt admitted he created some policies relating to Corizon's medical operations at CFCF.[284]   Dr. Blatt also admitted to creating policies or assignments of responsibility at the medical center, including the task of reviewing lab results.[285]   A reasonable jury could find Dr. Blatt served as a policymaker at Corizon.

Dr. Blatt also testified to what he believed to be Corizon's policy regarding the handling of studies mailed to Corizon.[286]   All x-ray studies performed off-site ordered by Corizon physicians were mailed back to CFCF directed to Dr. Blatt.[287]   Dr. Blatt explained he received all x-ray studies "as a matter of logistics."[288]   Dr. Blatt explained this procedure existed because many physicians at CFCF worked only nights or only on weekends.[289]   Having the studies directed to Dr. Blatt helped ensure timely review of the study by the appropriate physician.[290]   Dr. Blatt claimed, under this policy, he had no responsibility to review incoming studies ordered by physicians working at Corizon during the daytime.[291]   Dr. Blatt only delivered the study to the

ordering physician.[292]  Regional Medical Director Dr. Kalu disagrees with Dr. Blatt.  Dr. Kalu testified under Corizon's policy, Dr. Blatt should have reviewed all incoming x-ray studies, exercised his medical judgment, and ordered any further testing deemed necessary.[293]  There is an issue of fact regarding Corizon's policy on the review of x-ray studies mailed to Corizon.  Mr. Charleston also adduced evidence Dr. Blatt followed a practice of not exercising his medical judgment with respect to x-ray studies ordered by daytime physicians, which may have violated Corizon's actual policy.  Dr. Blatt failure to exercise his medical judgment against Dr. Limberakis's report raises a triable question of fact whether Dr. Blatt acted with deliberate indifference and violated Mr. Charleston's constitutional rights.  A reasonable jury could find a policymaker at Corizon violated Mr. Charleston's Fourteenth Amendment rights sufficient to impose liability against Corizon under *Monell*.  A reasonable jury could also find Dr. Blatt exercised a practice of not reviewing x-ray studies ordered by daytime physicians and the implementation of this policy violated Mr. Charleston's Fourteenth Amendment rights.

Mr. Charleston's second asserted policy fails.  Mr. Charleston failed to adduce evidence how the change in one or two nurses handling sick call requests to the rotation of nurses amounted to deliberate indifference of Mr. Charleston's constitutional rights.  Ms. Frias explained she implemented the change so all nurses would have experience in handling sick calls and would be prepared and capable in handling the calls when they arrive.[294]  Mr. Charleston does not adduce evidence contrary evidence for a reasonable jury to conclude the policy amounted to a deliberate indifference to Mr. Charleston's constitutional rights.

In support of his third asserted policy of failing to read sick call notes before treating a patient, Mr. Charleston cites PA McKinney's deposition testimony admitting she did not review Mr. Charleston's sick call notes before treating him, but instead preferred to ask Mr. Charleston

questions about his medical issues in person during the appointment.[295] PA McKinney's deposition testimony alone is insufficient to establish a policy or custom. Mr. Charleston does not adduce evidence whether PA McKinney is a policymaker at Corizon or whether PA McKinney did not read sick calls in furtherance of a particular Corizon policy, custom or practice. The testimony of one physician assistant is insufficient to suggest Corizon implemented a policy for its entire medical staff to not review sick call notes before providing care.

We deny Corizon's motion for summary judgment on Mr. Charleston's *Monell* claim.

**C. We deny Dr. Blatt's motion for summary judgment but grant the City, Warden Farrell, and Deputy Abello's and Ms. Frias's motions for summary judgment on Mr. Charleston's negligence claim.**

Ms. Frias and Dr. Blatt move for summary judgment to dismiss Mr. Charleston's negligence/medical malpractice claim. Ms. Frias argues she is not a medical provider, only an administrator, and Mr. Charleston does not adduce evidence of her personal involvement in his treatment. Dr. Blatt argues Mr. Charleston failed to adduce expert evidence opining he breached the standard of care and caused Mr. Charleston's injuries. The City, Warden Farrell and Deputy Warden Abello argue they enjoy governmental and official immunity against Mr. Charleston's negligence claim. Mr. Charleston does not respond to Ms. Frias's arguments. Mr. Charleston argues Dr. Homer Venter's expert opinion satisfies his burden in supporting his medical negligence claim against Dr. Blatt. Mr. Charleston does not respond to the City, Warden Farrell and Deputy Warden Abello's argument.

**1. Mr. Charleston failed to adduce evidence of Ms. Frias's involvement in his medical treatment or grievance process.**

Mr. Charleston alleges Ms. Frias is a medical provider whose conduct amounted to medical malpractice.[296] But Ms. Frias does not have medical training and served Corizon as an

administrator.[297]   Mr. Charleston failed to adduce evidence regarding Ms. Frias's personal involvement with his medical treatment in 2015.   Ms. Frias's role as Health Services Administrator alone is insufficient to support Mr. Charleston's negligence claim.   Ms. Frias never received an inmate grievance from Mr. Charleston.[298]   Absent evidence of Ms. Frias's involvement in Mr. Charleston's medical care or grievance process, we grant Ms. Frias's motion for summary judgment on Mr. Charleston's negligence/medical malpractice claim.

## 2. Mr. Charleston adduced expert evidence in support of his negligence claim against Dr. Blatt.

Dr. Blatt is incorrect in arguing Mr. Charleston failed to adduce expert evidence.   Mr. Charleston's expert Dr. Homer Venters opines Dr. Blatt's conduct violated the standards for health services in jail as outlined by the National Commission on Correctional Health Care.[299]   Dr. Venters opines Dr. Blatt's conduct, among others, caused a delay in Mr. Charleston's diagnosis and impacted his chance of cure and diminished his life capacity.[300]   We deny Dr. Blatt's motion for summary judgment on Mr. Charleston's negligence/medical malpractice claim.

## 3. The City, Warden Farrell, and Deputy Warden Abello enjoy immunity against Mr. Charleston's negligence claim.

Under the Political Subdivision Tort Claims Act, no local agency, except in limited circumstances, "shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[301]   Under the Act, a local agency employee enjoys official immunity to the extent of his employing agency, except in an action for damages "on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct."[302]   Willful misconduct "is

synonymous with 'intentional tort.'"[303]  "More specifically, willful misconduct occurs when the actor 'desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue.'"[304]  Willful misconduct is a "demanding level of fault."[305]

Mr. Charleston failed to adduce evidence Warden Farrell and Deputy Warden Abello acted with actual fraud, actual malice or willful misconduct.  Even accepting Mr. Charleston's position Warden Farrell and Warden Abello did not respond to his September 7th grievance as true, Mr. Charleston lacks evidence for a reasonable jury to find Warden Farrell and Warden Abello acted with actual fraud, malice, or engaged in willful misconduct.  Warden Farrell and Deputy Warden Abello's conduct may have acted with deliberate indifference towards Mr. Charleston's serious medical needs but deliberate indifference requires something less than intentional conduct.  Mr. Charleston does not adduce evidence the wardens failed to act out of ill will towards Mr. Charleston or with intent to subject Mr. Charleston to inadequate medical treatment.  Absent evidence of fraud, actual malice or willful misconduct, Mr. Charleston does not meet the demanding level of fault necessary to overcome the Political Subdivision Torts Claim Act.  Warden Farrell and Deputy Warden Abello enjoy official immunity.  The City enjoys governmental immunity.  The limited exceptions to governmental immunity do not apply to Mr. Charleston's medical negligence claim.[306]

### D. We grant summary judgment dismissing the intentional infliction of emotional distress claim because the City, Warden Farrell and Deputy Warden Abello are immune and Mr. Charleston failed to adduce evidence of extreme or outrageous conduct.

Mr. Charleston asserts a Pennsylvania state law claim for intentional infliction of emotional distress against all Defendants.  Mr. Charleston relies on the same conduct supporting his Fourteenth Amendment claim to support this state law claim.  The City argues it is immune from an intentional infliction of emotional distress claim under the Political Subdivision Tort

Claims Act.  All other Defendants argue Mr. Charleston has not adduced evidence to establish the conduct at issue rose to the level of extreme or outrageous to support an intentional infliction of emotional distress claim.

### 1. Mr. Charleston failed to adduce evidence of extreme and outrageous conduct by Ms. Frias.

Mr. Charleston failed to adduce evidence regarding Ms. Frias's personal involvement with his treatment in 2015.  Absent evidence of her conduct relating to Mr. Charleston's treatment and absent evidence of extreme and outrageous conduct relating to her decision to rotate nurses on sick call duties, we grant Ms. Frias's motion for summary judgment on Mr. Charleston's intentional infliction of emotional distress claim.

### 2. Mr. Charleston failed to adduce evidence of extreme and outrageous conduct by the Corizon medical personnel.

Under Pennsylvania law, an intentional infliction of emotional distress claim is established where there is "the most egregious conduct" and where the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society."[307]  "[I]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."[308]

In *Miller v. Hoffman*, the court denied summary judgment on an intentional infliction of emotional distress claim relating to inadequate medical care in prison when the evidence suggested the physician refused the plaintiff's request to see other physicians, cancelled appointments with specialists deemed necessary by the physician's colleagues, and placed the plaintiff in "reverse isolation" shutting the plaintiff from the outside world without medical

evidence supporting the decision.[309]  In *Rodriguez v. Smith*, the court explained "a continuous, deliberate refusal to provide necessary treatment for a brain tumor, together with verbal abuse could support a claim of intentional infliction of emotional distress."[310]

With respect to the Corizon medical personnel, Mr. Charleston failed to adduce evidence the conduct at issue is extreme or outrageous under Pennsylvania law.  This is not a case of outright refusal to provide medical care.  Mr. Charleston challenges the adequacy of his medical care.  The medical providers at Corizon took steps to respond to Mr. Charleston's complaints.  We have no evidence of the medical staff refusing to allow Mr. Charleston consult with other physicians or Corizon medical staff taking affirmative steps to cancel ordered treatment as in *Miller*.  We have the opposite; on numerous occasions, the Corizon medical staff sought guidance from others, including Dr. Blatt and Dr. Clemons, and brought Mr. Charleston in for their examination.  Dr. Mills, an optometrist, also examined Mr. Charleston.  We also have no evidence of verbal abuse as in *Rodriguez*.  Although Mr. Charleston stayed in solitary confinement during the end of November 2015 because of a physical altercation with another inmate, his stay in solitary confinement did not prevent his access to medical treatment as he visited Nurse Hamilton the following day and Dr. Mills two days later.  Further, unlike *Miller*, non-medical prison officials, not the Corizon medical staff, ordered Mr. Charleston be placed in solitary confinement.  The decision did not balance on a Corizon physician's unsupported medical decision to isolate Mr. Charleston.

Although Dr. Blatt may have been deliberately indifferent to Mr. Charleston's serious medical need by not acting himself in response to Dr. Limberakis's report, he did identify Dr. Clemons as the ordering physician and did make sure Dr. Clemons received the report by personally hand delivering it to her.  With respect to Dr. Clemons, she may have been

deliberately indifferent to Mr. Charleston by not reading Dr. Limberakis's report, but she did continue to provide Mr. Charleston with medical care and did not refuse him treatment. Mr. Charleston failed to adduce evidence Corizon or its staff engaged in extreme and outrageous conduct.

### 3. The City, Warden Farrell, and Deputy Warden Abello enjoy immunity against Mr. Charleston's intentional infliction of emotional distress claim.

The Political Subdivision Tort Claims Act bars personal injury suits against the City except in eight limited subject matters.[311] The eight limited subject matters include vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; and care, custody or control of animals.[312] The Political Subdivision Tort Claims Act bars Mr. Charleston's intentional infliction of emotional distress claim against the City. None of the eight limited subject matters are applicable to Mr. Charleston's inadequate medical treatment claim.[313] We grant the City's motion for summary judgment dismissing Mr. Charleston's intentional infliction of emotional distress claim.

As to Warden Farrell and Deputy Warden Abello, Mr. Charleston failed to adduce evidence the wardens acted with actual fraud, malice, or engaged in willful misconduct. Warden Farrell and Deputy Warden Abello's conduct may have acted with deliberate indifference but Mr. Charleston failed to adduce evidence to meet the demanding level of fault imposed by the Political Subdivision Tort Claims Act.

### E.  We partially dismiss Mr. Charleston's punitive damages demand.

All Defendants move to dismiss Mr. Charleston's request for punitive damages. The City argues it is immune from punitive damages. All other Defendants argue Mr. Charleston failed to adduce evidence sufficient for the jury to consider the imposition of punitive damages.

1. **We allow Mr. Charleston's request for punitive damages to proceed against Dr. Blatt, Dr. Clemons, Warden Farrell, and Warden Abello subject to evidence at trial.**

In a Section 1983 claim, "a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[314] Where a plaintiff adduces sufficient evidence for a jury to find the defendant acted with deliberate indifference to serious medical needs, "it follows logically that 'reckless or callous indifference' has been noticed."[315]

Under Mr. Charleston's negligence claims, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. As the name suggests, punitive damages are penal in nature and are proper only where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct . . . [W]hen assessing the propriety of the imposition of punitive damages, 'the state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.'"[316] "The Pennsylvania Supreme Court has held punitive damages may be awarded in negligence cases if the plaintiff proves greater culpability than ordinary negligence at trial."[317] A showing of gross negligence is not sufficient but a showing of reckless indifference to the right of another is sufficient for a jury to assess punitive damages.[318]

To the extent Mr. Charleston's Fourteenth Amendment claim survives against Dr. Blatt, Dr. Clemons, Warden Farrell, and Deputy Warden Abello, we cannot dismiss Mr. Charleston's punitive damages demand under Section 1983. Mr. Charleston adduced sufficient evidence for a reasonable jury to find Dr. Blatt, Dr. Clemons, Warden Farrell, and Deputy Warden Abello acted with reckless disregard to Mr. Charleston's medical needs. At this stage, his evidence is

sufficient for a jury to assess punitive damages against Dr. Blatt, Dr. Clemons, Warden Farrell, and Deputy Warden Abello under Section 1983 and under his state law negligence claim.

### 2. We allow Mr. Charleston to proceed on his punitive damages claim against Corizon under Section 1983 but not under his negligence claim.

Corizon's request to strike punitive damages is premature to the extent Mr. Charleston's *Monell* claim survives summary judgment.[319]

But Mr. Charleston also seeks to impose both direct and vicarious liability against Corizon under his state law negligence claim. To seek punitive damages for vicarious liability against Corizon for the negligence of its employees, Mr. Charleston must show Corizon "knew of and allowed the conduct by its agent that resulted in the award of punitive damages."[320] To seek punitive damages under a direct theory of corporate negligence, Mr. Charleston must satisfy Pennsylvania's punitive damages standard requiring an evil motive, reckless indifference to the rights of others, or willful or wanton conduct.[321]

On the vicarious liability negligence claim, Mr. Charleston fails to adduce evidence Corizon "knew of and allowed the conduct by its agent that resulted in the award of punitive damages." This is a different standard than the vicarious liability standard we apply under *Monell*. The only Corizon employees liable for punitive damages are Doctors Blatt and Clemons. Mr. Charleston fails to adduce evidence Corizon knew of Dr. Blatt's or Dr. Clemons's conduct relating to the treatment of Mr. Charleston. With respect to Dr. Blatt, Regional Director Dr. Kalu testified he had no idea Dr. Blatt did not perform clinical correlations or exercise his medical judgment in evaluating incoming x-ray studies. Mr. Charleston did not adduce evidence contradicting Dr. Kalu's testimony. As to Corizon's knowledge of Dr. Clemons's conduct, Mr. Charleston failed to adduce evidence for a reasonable jury to find Corizon knew she received Dr. Limberakis's report but failed to exercise her medical judgment against the report.

Mr. Charleston also failed to adduce evidence to impose punitive damages against Corizon on a direct corporate negligence theory. Mr. Charleston failed to adduce evidence Corizon acted with an evil motive or reckless indifference to Mr. Charleston's rights or acted willfully, wantonly or maliciously. Although Mr. Charleston's claim against Corizon under *Monell* will proceed to trial and Corizon may be liable for punitive damages under Section 1983, we must distinguish direct and vicarious liability and federal and state standards. Applying *Monell*, we found a reasonable jury could find the evidence of Dr. Blatt's deliberate indifference sufficient to impose liability against Corizon. Mr. Charleston seeks to hold Corizon liable directly for its own conduct, not through the conduct of its agents like Dr. Blatt. But Mr. Charleston fails to adduce evidence of Corizon's conduct sufficient to ask a jury to assess punitive damages. We dismiss Mr. Charleston's request for punitive damages under his negligence claim against Corizon.

### 3. The City is immune from punitive damages and Mr. Charleston's claims against the City do not survive summary judgment.

In *City of Newport v. Fact Concerts, Inc.*, the Supreme Court held a municipality is immune from punitive damages under Section 1983.[322] The Political Subdivision Torts Claim Act also offers a municipality immunity against the imposition of punitive damages.[323]

We grant the City's motion for summary judgment dismissing Mr. Charleston's claim for punitive damages because the City is immune from punitive damages and Mr. Charleston's claims against the City do not survive summary judgment.

### 4. We strike Mr. Charleston's punitive damages claim against the remaining Defendants sued for negligence.

Mr. Charleston failure to adduce evidence of reckless disregard to his medical needs as to Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse

McGettigan, Licensed Nurse Practitioner Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, PA Orji, and Ms. Frias, and Mr. Charleston's failure to adduce evidence of evil motive, wanton or willful behavior as to these remaining Defendants requires dismissal of Mr. Charleston's request for punitive damages without prejudice. Should Mr. Charleston adduce evidence of evil motive, reckless indifference or willful, wanton or malicious conduct at trial, Mr. Charleston may renew his request for punitive damages.

### III.    Conclusion

We dismiss Mr. Charleston's Fourteenth Amendment claim against Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse McGettigan, Licensed Nurse Practitioner Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, PA Orji, and Ms. Frias. We dismiss Mr. Charleston's *Monell* claim against the City for failing to adduce evidence of a custom, policy, or practice causing Mr. Charleston's constitutional rights. We dismiss Mr. Charleston's negligence claim against Ms. Frias, the City, Warden Farrell, and Warden Abello. We dismiss Mr. Charleston's intentional infliction of emotional distress claim against all Defendants for failing to adduce evidence of extreme or outrageous conduct and to adduce evidence of willful misconduct or malice from Warden Abello and Deputy Warden Farrell.

---

[1] Our Policies require a Statement of Undisputed Material Facts in support of a Rule 56 motion, as well as an appendix of exhibits. City of Philadelphia, Warden Michelle Farrell, Deputy Warden Frederick Abello, Corizon Health, Inc., Kristin Popelak, R.N., Dulie Rene, R.N., Karen McKinney, P.A., Marie Whatley, R.N., Danielle McGettigan, L.P.N., Anita Diorio, R.N., Mary Duffy, R.N., Charlotte Hamilton, N.P., Roseanna Green, N.P., Christina Marshall, R.N., Constance Orji, P.A., Elmeada Frias, Bruce Blatt, M.D., and Robin Clemons, M.D. moved for summary judgment. City of Philadelphia, Warden Farrell, and Deputy Warden Abello filed a

Statement of Undisputed Material Facts at ECF Doc. No. 136 ("City SUMF") and appendix at ECF Doc. No. 136-3 through 136-6. Wayne Charleston responded to the City SUMF and submitted a Statement of Additional Undisputed Facts at ECF Doc. No. 159 ("Charleston-City SUMF"). Corizon, Nurse Popelak, Nurse Rene, PA McKinney, Nurse Whatley, Licensed Practical Nurse McGettigan, Nurse Diorio, Nurse Duffy, Nurse Practitioner Hamilton, Nurse Practitioner Green, Nurse Marshall, PA Orji, and Ms. Frias filed a Statement of Undisputed Material Facts at ECF Doc. No. 137 ("Corizon SUMF") and appendix at ECF Doc. No. 137-3 through 137-6. Mr. Charleston responded to the Corizon SUMF and submitted a Statement of Additional Undisputed Facts at ECF Doc. No. 158 ("Charleston-Corizon SUMF"). Dr. Blatt filed a Statement of Undisputed Material Facts at ECF Doc. No. 135 ("Blatt SUMF") and appendix at ECF Doc. No. 135-1 through 135-4. Mr. Charleston responded to the Blatt SUMF and submitted a Statement of Additional Undisputed Facts at ECF Doc. No. 156 ("Charleston-Blatt SUMF"). Dr. Blatt filed a supplemental appendix attached to his reply brief at ECF Doc. No. 169-1. Dr. Clemons filed a Statement of Undisputed Material Facts at ECF Doc. No. 133-1 ("Clemons SUMF") and appendix at ECF Doc. No. 133-2 through 133-10. Mr. Charleston responded to the Clemons SUMF and submitted a Statement of Additional Undisputed Facts at ECF Doc. No. 157 ("Charleston-Clemons SUMF").

Rather than file a separate appendix in response to each motion for summary judgment as instructed in our Policies, Mr. Charleston filed an omnibus appendix with supplemental exhibits in support of his responses to all motions at ECF Doc. No. 160 through 160-3. Also violating our Policies, Mr. Charleston did not consecutively bates stamp his supplemental exhibits to the Defendants' appendices. References to the appendices shall be referred to by ECF number.

[2] Blatt SUMF at ¶ 16.

[3] *Id.*

[4] City SUMF at ¶ 3.

[5] Blatt SUMF at ¶ 5.

[6] *Id.* ¶ 7-8.

[7] ECF Doc. No. 160-2 at p. 88.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at pp. 92-93.

[12] ECF Doc. No. 133-4 at p. 6.

[13] ECF Doc. No. 160-2 at pp. 96-97.

[14] ECF Doc. No. 133-4 at p. 6.

[15] ECF Doc. No. 160-2 at pp. 99-100.

[16] ECF Doc. No. 133-4 at pp. 6-7.

[17] ECF Doc. No. 160-2 at pp. 102-04.

[18] *Id.* at pp. 106-07.

[19] *Id.*

[20] ECF Doc. No. 160-1 at p. 44.

[21] *Id.* at p. 45.

[22] *Id.* at pp. 47-48.

[23] *Id.* at pp. 47-48.

[24] *Id.*

[25] *Id.* at p. 59.

[26] *Id.* at pp. 70-71.

[27] *Id.*

[28] ECF Doc. No. 133-4 at p. 7.

[29] ECF Doc. No. 160-1 at p. 80.

[30] *Id.* at p. 82.

[31] *Id.* at p. 84.

[32] ECF Doc. No. 133-4 at p. 7.

[33] *Id.*

[34] *Id.*

[35] ECF Doc. No. 160-1 at p. 86.

[36] *Id*. at pp. 88-90.

[37] *Id*.

[38] *Id*.

[39] *Id*. at pp. 92-93.

[40] *Id*.

[41] *Id*.

[42] *Id*.

[43] *Id*.

[44] *Id*.

[45] *Id*.

[46] *Id*.

[47] Blatt SUMF at ¶ 18.

[48] *Id*.

[49] *Id*.

[50] *Id*. ¶ 19.

[51] *Id*.

[52] ECF Doc. No. 160-1 at p. 102.

[53] *Id*. at p. 104.

[54] *Id*. at p. 110.

[55] *Id*.

[56] *Id*.

[57] *Id*.

[58] *Id.*

[59] *Id.* at p. 106.

[60] ECF Doc. No. 160-3 at pp. 39-40.

[61] *Id.*

[62] *Id.* at p. 43.

[63] ECF Doc. No. 160-1 at p. 108.

[64] Clemons SUMF at ¶ 8.

[65] ECF Doc. No. 160-1 at p. 141.

[66] *Id.*

[67] Clemons SUMF at ¶ 9.

[68] ECF Doc. No. 133-6 at p. 6.

[69] ECF Doc. No. 160-1 at p. 141.

[70] *Id.*

[71] Clemons SUMF at ¶ 9.

[72] *Id.*

[73] ECF Doc. No. 160-1 at p. 141; ECF Doc. No. 133-6 at p. 7.

[74] ECF Doc. No. 160-1 at p. 142; Clemons SUMF at ¶ 10.

[75] ECF Doc. No. 160-1 at p. 142.

[76] ECF Doc. No. 133-6 at p. 12.

[77] Blatt SUMF at ¶ 27.

[78] ECF Doc. No. 160-1 at p. 112.

[79] *Id.* at pp. 114-16.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] ECF Doc. No. 160-1 at p. 123.

[84] *Id.*

[85] Clemons SUMF at ¶ 9.

[86] ECF Doc. No. 160-1 at p. 125.

[87] *Id.*

[88] Clemons SUMF at ¶ 12.

[89] *Id.* ¶ 11.

[90] *Id.* ¶ 11.

[91] ECF Doc. No. 133-6 at p. 25.

[92] Clemons SUMF at ¶ 12.

[93] *Id.* ¶ 12.

[94] ECF Doc. No. 160-1 at pp. 126-27.

[95] Blatt SUMF at ¶ 29.

[96] *Id.* ¶ 29.

[97] *Id.* ¶ 30.

[98] ECF Doc. No. 160-1 at pp. 26-27.

[99] *Id.*

[100] *Id.* at p. 26.

[101] *Id.*

[102] Blatt SUMF at ¶ 31.

[103] *Id.* ¶ 31.

[104] ECF Doc. No. 160-1 at p. 21.

[105] *Id.*

[106] ECF Doc. No. 160-1 at p. 18-19.

[107] *Id.* at p. 20.

[108] Blatt SUMF at ¶ 32.

[109] *Id.*

[110] *Id.*

[111] ECF Doc. No. 160-1 at pp. 20-21.

[112] *Id.* at p. 35.

[113] *Id.*; Clemons SUMF at ¶ 16.

[114] ECF Doc. No. 133-6 at p. 29.

[115] Clemons SUMF at ¶ 16.

[116] ECF Doc. No. 160-1 at p. 35.

[117] *Id.* at pp. 134-35.

[118] *Id.*

[119] ECF Doc. No. 133-4 at p. 11.

[120] ECF Doc. No. 160-1 at 137-39.

[121] *Id.*

[122] Clemons SUMF at ¶ 18.

[123] ECF Doc. No. 133-6 at p. 37.

[124] Clemons SUMF at ¶ 18.

[125] *Id.*

[126] *Id.* at ¶ 19.

[127] ECF Doc. No. 160-1 at pp. 144-45.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] ECF Doc. No. 160-3 at p. 18.

[134] *Id.*

[135] *Id.*

[136] ECF Doc. No. 160-1 at pp. 149-50.

[137] *Id.*

[138] *Id.*

[139] *Id.* at p. 154.

[140] *Id.*

[141] *Id.*

[142] ECF Doc. No. 133-4 at p. 12.

[143] *Id.*

[144] ECF Doc. No. 160-1 at pp. 155-56.

[145] *Id.* pp. 155-56.

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] *Id.* at pp. 158-59.

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] ECF Doc. No. 135-1 at p. 78.

[165] ECF Doc. No. 160-2 at pp. 36-37.

[166] *Id.*

[167] *Id.*

[168] *Id.* at pp. 36-37, 43.

[169] *Id.* at p. 49.

170 ECF Doc. No. 160-3 at pp. 20-21.

171 ECF Doc. No. 133-4 at p. 14.

172 *Id.*

173 *Id.*

174 ECF Doc. No. 160-1 at pp. 81-82.

175 *Id.*

176 *Id.*

177 Blatt SUMF at ¶ 44.

178 *Id.*

179 ECF Doc. No. 135-1 at pp. 79-81.

180 *Id.* at p. 80.

181 ECF Doc. No. 135-3 at p. 207.

182 ECF Doc. No. 160-1 at p. 38.

183 *Id.*

184 ECF Doc. No. 135-3 at p. 208.

185 ECF Doc. No. 160-3 at p. 45.

186 *Id.*

187 *Id.*

188 *Id.*

189 ECF Doc. No. 135-3 at p. 209.

190 Blatt SUMF at ¶ 47.

191 *Id.* ¶ 48; ECF Doc. No. 160-1 at pp. 161-62.

192 Blatt SUMF at ¶ 49.

[193] ECF Doc. No. 135-2 at pp. 1-4.

[194] ECF Doc. No. 135 at p. 1.

[195] Blatt SUMF at ¶ 49.

[196] Clemons-Charleston SUMF at ¶ 20.

[197] *Id.*

[198] ECF Doc. No. 160-2 at pp. 30-31.

[199] *Id.* at pp. 33-34.

[200] *Id.* at p. 31.

[201] *Id.* at p. 30.

[202] *Id.* at p. 32.

[203] *Id.* at p. 112.

[204] *Id.*

[205] *Id.* at pp. 112, 135-36.

[206] *Id.* at pp. 135-36.

[207] *Id.* at p. 138.

[208] *Id.* at pp. 136-37.

[209] *Id.* at p. 137.

[210] *Id.*

[211] *Id.*

[212] *Id.* at p. 138.

[213] *Id.*

[214] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[215] 436 U.S. 658 (1978).

[216] Dr. Blatt also argues a "but-for" causation standard applies to Mr. Charleston's Section 1983 claim and Mr. Charleston failed to adduce expert evidence identifying Dr. Blatt's conduct as a "but-for" cause of Mr. Charleston's injuries. Dr. Blatt does not cite controlling authority. We apply the causation standard articulated by our court of appeals. "It is axiomatic that '[a] 1983 action, like its state court analogs, employs the principle of proximate causation.'" *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (citation omitted). In a Section 1983 action, the plaintiff must establish a "plausible nexus" or "affirmative link" between the defendant's conduct and the deprivation of the constitutional right. *Id*. (citation omitted). As discussed in our Memorandum, Mr. Charleston adduces expert evidence identifying Dr. Blatt's conduct as a cause of Mr. Charleston's injury.

[217] 42 U.S.C. § 1983.

[218] *Natale v. Camden Cnty. Corr. Fac.*, 318 F.3d 575, 581-82 (3d Cir. 2003). As to all Defendants, we dismiss Mr. Charleston's Eighth Amendment claim as Mr. Charleston admits his status as a pretrial detainee during the relevant time period governing his claims and only the Fourteenth Amendment is applicable. ECF Doc. No. 161-1 at p. 4.

[219] *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citation omitted).

[220] *Natale*, 318 F.3d at 582.

[221] *Id*. (citing *Rouse v. Plaintier*, 182 F.3d 192, 197 (3d Cir. 1999)).

[222] *Rouse*, 182 F.3d at 197.

[223] *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

[224] *Farmer*, 511 U.S. at 837.

[225] *Pearson v. Prison Health Servs.*, 850 F.3d 526, 542 (3d Cir. 2017) (*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)).

[226] *Pearson*, 850 F.3d at 538 (citation omitted).

[227] *Natale*, 318 F.3d at 582.

[228] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[229] *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).

[230] *Id.* at 228 (citation omitted).

[231] *Brown v. Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) (citing *Youngberg v. Romero*, 457 U.S. 307, 322-23 (1982)).

[232] *Durmer*, 991 F.2d at 69.

[233] 372 F.3d 218, 236 (3d Cir. 2004).

[234] *Id.* at 237.

[235] 850 F.3d 526, 540 n. 4 (3d Cir. 2017) (internal citation omitted).

[236] *Miller v. Hoffman*, No. 97–7987, 1998 WL 404034, at *3 (E.D. Pa. July 7, 1998) (citing *Rode*, 845 F.2d at 1207).

[237] *Santiago*, 629 F.3d at 128.

[238] *Id.* at 129.

[239] *A.M. v. Luzerne Cnty. Juvenile Det. Cntr.*, 372 F.3d 572, 586 (3d Cir. 2004).

[240] Corizon SUMF at ¶¶ 6-7, 9.

[241] *Id.* ¶ 6.

[242] *Id.* ¶ 7.

[243] *Id.* ¶ 9.

[244] ECF Doc. No. 160-2 at pp. 92-93.

[245] *Id.*

[246] *Id.* at pp. 106-07.

[247] *See Estelle*, 429 U.S. at 106.

[248] *See Pearson*, 850 F.3d at 542 (citing *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346.

[249] *Id.* (citation omitted).

[250] ECF Doc. No. 160-1 at pp. 20-21

[251] *Id.* at pp. 11-14

[252] *Id.* at p. 14.

[253] *Id.* at pp. 20-21.

[254] *Id.* at p. 35.

[255] *See Pearson*, 850 F.3d at 540 n. 4.

[256] ECF Doc. No. 160-2 at p. 112.

[257] Corizon SUMF at ¶ 38.

[258] *Id.* ¶ 38.

[259] *Id.* ¶ 40.

[260] ECF Doc. No. 135-3 at p. 121.

[261] *Id.*

[262] City SUMF at ¶ 5.

[263] ECF Doc. No. 136-3 at p.31.

[264] ECF Doc. No. 160-2 at pp. 144-47.

[265] ECF Doc. No. 160-3 at pp. 35-37.

[266] ECF Doc. No. 136-6 at pp. 3-5.

[267] ECF Doc. No. 160-3 at p. 36.

[268] *Id.*

[269] 42 U.S.C. § 1983.

[270] *Monell v. New York City. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Corizon does not dispute it acted under color of state law. ECF Doc. No. 137-1 at pp. 7-8.

[271] *Vargas v. City of Phila.*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[272] *Natale*, 318 F.3d at 584.

[273] *Id.* (citing *Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

[274] *Id.* (citations omitted).

[275] *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).

[276] ECF Doc. No. 158 at pp. 2-5.

[277] *Id.*

[278] *Id.*

[279] *Id.* at pp. 4-5.

[280] *Id.*

[281] *Id.* at p. 5.

[282] ECF Doc. No. 160-1 at p. 23.

[283] *Id.* at p. 23.

[284] *Id.*

[285] ECF Doc. No. 135-3 at p. 82.

[286] ECF Doc. No. 160-1 at p. 21.

[287] *Id.*

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] *Id.* at pp. 5, 11, 14.

[294] ECF Doc. No. 135-3 at p. 121.

[295] ECF Doc. No. 160-1 at pp. 99-100.

[296] ECF Doc. No. 93 at ¶¶ 91-97.

[297] Corizon SUMF at ¶ 38.

[298] *Id.* ¶ 40.

[299] ECF Doc. No. 160-1 at p. 131-32.

[300] *Id.* at p. 128.

[301] 42 Pa. Cons. Stat. §§ 8541-42.

[302] *Id.* §§ 8545, 8550.

[303] *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1023 (Pa. Cmmw. Ct. 2014) (quoting *R.H.S. v. Alleghany Cnty. Dep't of Human Servs.*, 936 A.2d 2329, 1230 (Pa. Cmmw. Ct. 2007)).

[304] *Id.*

[305] *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (M.D. Pa. 2011) (quoting *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006)).

[306] *See* 42 Pa Cons Stat. § 8542(b).

[307] *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).

[308] *Id.* (quoting Restatement (Second) of Torts § 46, comment d).

[309] 1999 WL 415397, *8-9 (E.D. Pa. Jun. 22, 1999).

[310] 2006 WL 680965, *15 (E.D. Pa. Mar. 16, 2006).

[311] 42 Pa. Cons. Stat. §§ 8541-42.

[312] *Id*. § 8542(b).

[313] *Id*. § 8542(b).

[314] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

[315] *Bermundez v. City of Philadelphia*, No. 06-4701, 2007 WL 1816469, at *3 (E.D. Pa. Jun. 21, 2007).

[316] *Hutchinson v. Luddy*, 870 A.2d 766, 770 (Pa. 2005).

[317] *Brand Mktg. Grp., LLC v. Intertek Testing Servs.*, 801 F.3d 347, 358 (3d Cir. 2015) (citing *Hutchinson*, 870 A.2d at 773).

[318] *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).

[319] *See Bermundez*, 2007 WL 1816469, at *3.

[320] 40 Pa. Stat. § 1303.505(c).

[321] *Hutchinson*, 870 A.2d at 770.

[322] 453 U.S. 247, 271 (1981).

[323] 42 Pa. Cons. Stat. § 8553(c); *The Choice is Yours, Inc. v. The Choice is Yours*, No. 14-1804, 2015 WL 5584302, at *8 (E.D. Pa. Sept. 22, 2015).